[No. 547. Decided July 7, 1892.]

EDSON KEITH, ALEXANDER ADAMS AND ALBERT E. FAXON, *Respondents*, v. SAMUEL KREIDEL, ISAAC HARRIS, WILLIAM HARRIS, ABRAHAM KREIDEL, ABRAHAM LEVY, MARKS HARRIS, J. COHN AND S. COHN, *Appellants*.

FRAUDULENT CONVEYANCES—SUFFICIENCY OF EVIDENCE.

In an action by judgment creditors to set aside a conveyance of real estate and mortgages on a stock of goods, made by the debtor to defraud his creditors, a decree in favor of plaintiffs is upheld by sufficient evidence, where it appears that the parties to the conveyance and mortgages are relatives; that the deed, though dated some months prior to the debtor's failure, was not recorded until two days before his giving the mortgages, and had never been in the hands of the grantee; that a note formerly given by the debtor to his father-in-law, for the payment of which the conveyance was made, had been altered, and made to become due at a later date than the time which had been specified for its payment when given; that the note and indorsements thereon of the payment of interest for several years after its execution, had, with one exception, all been made at the same time, with the same ink, and by the debtor himself; that the note had been recently executed, but rubbed and torn with intent to give it an aged appearance; that one of the mortgagees, having procured the interest of the first attaching creditor, prosecuted the same to judgment and to a sale of the property thereunder, and gave an order upon the debtor for the payment of the sheriff's fees, which were paid in trade out of

the stock of goods in the course of business carried on by said debtor; that the debtor was allowed by the grantee and mortgagees to carry on the business, giving credit, collecting money on the books and selling the mortgaged property without applying the proceeds to the judgment or the mortgages, so continuing until the mortgaged property was nearly all sold, the mortgagee's indebtedness remaining unsatisfied; that new goods were brought and mixed with the goods mortgaged, and the business conducted by the debtor as it had been prior to the transfers, while he occupied part of the real estate for his residence without payment therefor. (Hoyt, J., dissents.)

*Appeal from Superior Court Kittitas County.*

*Bausman, Kelleher & Emory,* for appellants.
*Davidson & McFalls,* for respondents.

The opinion of the court was delivered by

Scott, J.—The respondents, Edson Keith & Co., plaintiffs below, were judgment creditors of the defendant Samuel Kreidel, who was accused of having made a fraudulent deed to one of his co-defendants of certain lands, comprising all the real estate owned by him, and of having made several fraudulent chattel mortgages to the others, respectively, which mortgages covered all of his personal property. The complaint alleges the rendition of judgment in favor of plaintiffs against Kreidel for the purchase money of goods sold to him to the amount of $2,000, and that execution was issued thereon, and was duly returned wholly unsatisfied, and that the debt for which said judgment was obtained was contracted previous to the making of said transfer and mortgages. It alleges Kreidel was a merchant doing business in the city of Ellensburgh, in the county of Kittitas, in this state; that said business consisted of dealing in dry goods and general merchandise; that his stock of goods was of the value of $20,000, and that he was the owner of certain real estate and was reputed to be worth $16,000 or more above all liabilities, and upon this reputation was able

to and did get large credit from various parties, including
the plaintiffs; that after contracting said indebtedness he
failed in business, and previous thereto, in anticipation of
said failure, he conspired with the defendants and executed
to them the conveyances as aforesaid, with the intent and
purpose of disposing of his property in fraud of his credi-
tors, or to so conceal and place it where his creditors could
not reach it; that there was a mutual agreement between
said Kreidel and the other defendants to the effect that said
mortgages should be foreclosed, and the property sold and
bid in by the mortgagees for the benefit of the mortgagor,
all of which mortgages were executed to become due one
day after date, and foreclosure proceedings were instituted
thereon.   Subsequent to the giving of said mortgages, and
pending the foreclosure proceedings, certain creditors of
Kreidel commenced suit against him, and attached the prop-
erty mortgaged.   It was alleged that defendant William
Harris, to strengthen the claims of said defendant, and in
furtherance of said scheme, procured an assignment to him-
self of the lien of the first attaching creditor, and that under
said first attachment the personal property was sold and bid
in by said William Harris for the sum of $2,500, no one
bidding against him; that he knew at the time he so bid in
the property that the mortgages were fictitious and that he
was one of the parties conspiring to carry out said fraudu-
lent scheme; that there was an understanding that said
mortgages were not to be paid; that they were executed to
prevent other creditors from proceeding against the prop-
erty, or from bidding on it at the sheriff's sale; that said
William Harris went into the nominal possession of said
personal property, but that the actual possession thereof
continued in and was retained by Kreidel, who continued
to carry on the business as before; that the pretended in-
debtedness named and set forth in said conveyances was
fictitious; that said Kreidel was not indebted to said de-

fendants, or any of them; and that he had no other property which could be subjected to the payment of his indebtedness, but was wholly insolvent.

None of the defendants, saving Marks Harris and Isaac Harris, made answer to the complaint, and default was entered against them. After the time for answering had expired, and default had been entered, an attempt was made by some of them to answer, but the superior court held the showing insufficient, and refused to set aside the defaults.

Samuel Kreidel was a son-in-law of Marks Harris, and was formerly in partnership with him, conducting a mercantile business at Seattle, in this state. This partnership was dissolved in 1886, and, upon its dissolution, appellants claim Kreidel purchased the interest of said Marks Harris in said business for the sum of $12,000, and gave him his note therefor, without any security. The deed of the real estate in question was executed June 24, 1890, by the defendant Kreidel to Marks Harris, it is claimed, in payment of this indebtedness. The property was considered to be worth $30,000. The recited consideration was $32,000, the property being subject at the time to a mortgage of $13,900, and a lien for $2,150, and also to a claim of another party, the amount of which is not stated. This deed was not placed upon record, it seems, until two days before the failure of Kreidel, in September, 1890. Isaac Harris was a brother-in-law of Kreidel, and William Harris was his wife's uncle.

The superior court found for the plaintiffs, and adjudged that said deed and mortgages were made for the purpose of perpetrating a fraud upon the creditors of Kreidel, including the plaintiffs, and set the same aside. All the defendants, excepting Kreidel, appealed from this decree, and the contest is as to the sufficiency of the evidence to sustain it.

After his purchase of the goods at the sheriff's sale resulting from the prosecution of the attachment lien ob-

tained by him, and on the 1st day of November, 1890,
William Harris transferred by bill of sale said personal
property to Marks Harris, Kreidel still remaining in pos-
session, and continuing to sell said goods without applying
any of the proceeds to the payment of the mortgages.
New goods were purchased from time to time and were
commingled with the mortgaged goods.   On the 14th day
of October, 1890, the real estate was transferred by Marks
Harris to one Lipman Sachs, Kreidel meantime continuing
to occupy the same, although it is claimed he paid rent to
Marks Harris up to the time of the trial.

Appellants contend there was no evidence, beyond mere
badges of fraud, shown to establish the allegations of the
plaintiffs, and that these were all satisfactory and clearly
explained by testimony which was introduced by the de-
fendants, and, consequently, the court erred in adjudging
said conveyances to be fraudulent; that badges of fraud
should not be given the force or effect of overcoming direct
testimony going to show the transactions were *bona fide*
for the purpose of paying and securing actually existing
indebtedness; that the transactions amounted to nothing
more than a preference of creditors, which is recognized as
legal and authorized in this state.   It seems to us, how-
ever, the proof goes farther than this.   There were many
circumstances shown going to substa·      te the charges of
fraud, such as the relationship of        parties, and the
further fact that the deed to the rea      e was kept from
the records until Kreidel was unat         ger continue in
business, whereby the knowledge ·          ing been given
was concealed from the public, anu .       l at said times
being in possession of the real estate, and the apparent
owner thereof, and being by virtue of the circumstances
enabled to procure a large amount of credit, and his con-
tinuing to purchase goods up to the last moment, together
with the fact that prior to the execution of the deed said

Marks Harris, when he sought to obtain payment of the note, as is claimed by him, instead of seeking Kreidel, who gave the note, to obtain payment, first went to a stranger, one Mr. Gross, for the purpose of getting his advice as to getting his pay, without having asked Kreidel whether he could pay or not, or whether he could give any security therefor. It looks as though this was a studied. attempt on the part of Marks Harris to provide evidence of his efforts to collect payment of said note, and evidence of the good faith of the transaction. Certain expert testimony was introduced to show this note had been altered, and made to become due at a later date than the time which had been specified for its payment when it was given. According to this testimony the note, and indorsements thereon purporting to give credit for interest paid for several years after its execution, had, with the exception of the last one, all been made at the same time, with the same ink and by the same person; that the note had been recently executed, and had been rubbed by an erasure upon its surface for the purpose of giving it an aged appearance; that it had been folded and rubbed on its edges, and then torn in two, said rubbing having been done to give it a worn appearance, as though it had become separated by wear in consequence of having been carried in a pocket; that if it had been worn into two pieces, the edges would have been smooth, but, as it was, the edges were rough and sharply defined, as if they had been torn. There was testimony to show that the note and indorsements, with the one exception, were in Kreidel's handwriting.

In relation to the stock of merchandise, it appears in the prosecution of the attachment suit by William Harris, who procured the interest of the first attaching creditor, and prosecuted the same to judgment, and to a sale of the property thereunder, that certain expenses were incurred, such as sheriff's fees, amounting to several hundred dollars.

Instead of his paying the same, an order was given upon Kreidel for the payment thereof, and the same were paid or traded out of the stock of goods during the course of business subsequently carried on by said Kreidel. It is contended by appellants, however fraudulent the original transactions may have been, that William Harris had the same right which any other person would have had to purchase a valid claim against the defendant, and to prosecute the same to judgment and sale of the property, and that he could purchase the property and obtain a valid title thereto regardless of any fraud as to other transactions to which he was a party. This might be true if it was an actual *bona fide* purchase of this attachment claim for which the purchaser paid, but the respondents contend this claim was purchased in reality by the defendant Kreidel, and that it was the proceeds of his property which paid for the same, and that the defendant William Harris paid nothing therefor. This certainly has some support in the proof, in that the expenses of such suit were paid by Kreidel out of the very goods which were subsequently, by William Harris, transferred to Marks Harris, and by him turned over to Kreidel. It is true this was done under a purported arrangement that Kreidel was to carry on the business for said Marks Harris for a stipulated salary, but the circumstances altogether seem to us to offer direct evidence that the whole scheme was a fraudulent one, entered into by the defendants for the purpose of defrauding Kreidel's creditors. It does not appear what became of the deed of the real estate after its execution until about the time for the scheme to ripen, if a scheme it was, and when it was found it was not in the hands of the grantee, Marks Harris, but was in the custody of William Harris, who placed the same on record. No explanation was offered for the delay in recording this instrument, nor any proof as to where the deed was or had been prior to this time. When Kreidel was

pressed by his creditors, and threatened with suit, said deed was placed on record, and he gave the mortgages aforesaid upon all his personal property, being his stock of goods and book accounts, to the parties mentioned, among whom was said William Harris, the only one who appears to have been on the ground at the time.

Kreidel testified he did not know what he was going to do an hour before he executed the mortgages. He also testified that William Harris had no knowledge thereof, yet this is hardly consistent with the fact that two days before these mortgages were given, William Harris had placed this deed given to Marks Harris on record, and that no explanation of the delay in having the same recorded was in any wise offered. On the day these mortgages were executed it seems Isaac Harris, to whom one of them was given, was not present and had no knowledge thereof. He was notified by telegraph, and wired he would accept the same; and at the time William Harris took possession of the goods it further appears no inventory was taken; that the defendant Kreidel had previously continued to purchase goods right up to the time aforesaid, and at that time some forty odd boxes of boots and shoes were piled up in front of the store unopened, though these were subsequently replevied; that on the first day of November the said William Harris purported to convey said stock of goods to Marks Harris, and in the short period of about four months it seems the father-in-law had thus been made the nominal owner of all the property, both real and personal, which formerly belonged to Kreidel, including even his exemptions; that said Kreidel was in full possession of the same and carrying on the business under a nominal salary, paying the expenses of the previous proceeding out of the business, giving credit, collecting money on the books, and selling the mortgaged property without applying the proceeds to the payment of the mortgages, and this was continued until the mortgaged

property was nearly all sold; and yet the alleged mortgage indebtedness was still unsatisfied and existing against him, new goods were purchased and mixed with the goods mortgaged, and to all intents and purposes Kreidel conducted the business as he had previously conducted it prior to the transfers, occupying part of the real estate for his residence without paying any rent therefor. It is claimed he paid rent for a portion of it to Marks Harris during all of said time, although he had conveyed said real estate to Lipman Sachs. There is no explanation of many of these suspicious circumstances in the record.

We think there is evidence enough to sustain the findings made. At any rate, upon the whole case, we do not feel we would be justified in disturbing the decree of the learned judge of the lower court, and the same is hereby affirmed.

ANDERS C. J., and DUNBAR and STILES, JJ., concur.

HOYT, J. (*dissenting*).—I am unable to agree with the conclusions of the majority in this case. The question decided, however, being almost exclusively one of fact, a lengthy discussion would be of no profit. I shall, therefore, content myself with saying that, in my opinion, none of the circumstances relied upon to establish fraud on the part of the defendants are sufficient to more than arouse a suspicion, and are entirely insufficient to establish fraud. If the facts are to be investigated from a standpoint that fraudulent acts had probably been committed, some circumstances may appear which tend to establish fraud. The rule of law, however, as I understand it, is that fraud will never be presumed; hence, it is the duty of the court to assume that all the acts of the parties engaged in the transaction were proper and lawful until the contrary appears, and to investigate all the circumstances with the view of harmonizing them with such lawful purpose. With this rule as a basis, all the circumstances relied upon as tending

to establish fraud, can easily be explained upon some theory consistent with a lawful purpose on the part of the defendants. I think the judgment should be reversed, and the bill dismissed.